IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORA CROYLE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-cv-0158 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

CONTI, District Judge

***Introduction***

Pending before this court is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "defendant") denying the claims of Nora Croyle ("plaintiff"

or "claimant") for disability insurance benefits ("DIB") under Title II of the Social Security Act

("SSA"), 42 U.S.C. §§ 423 et. seq.  Plaintiff argues that the decision of the administrative law

judge (the "ALJ") should be reversed and remanded for further consideration because the ALJ's

determination is not supported by substantial evidence.  Specifically, plaintiff argues that a

remand is warranted because the ALJ misconstrued or ignored relevant evidence of record and

based his decision instead on his own speculative inferences.  Defendant argues that the decision

of the ALJ is supported by substantial evidence and, therefore, should not be reversed and

remanded.  The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the

Federal Rules of Civil Procedure.  The court will deny the motions for summary judgment filed

by plaintiff and defendant and the case will be remanded for further proceedings consistent with this opinion.

### *Procedural History*

Plaintiff protectively filed for DIB on August 24, 2004, (R. at 12), claiming that she became disabled and unable to work on May 31, 2000, which was amended to January 2002.  (R. at 72, 92, 644).  Plaintiff asserted in her application that she became unable to work as a result of the effects of an artery bypass in her leg, clogged arteries and mini-strokes. (R. at 72). Plaintiff's claims were initially denied on October 14, 2005. (R. at 12, 33).  A timely written request for a hearing before an administrative law judge was filed by plaintiff, (R. at 7), and a hearing was held on April 24, 2006. (R. at 634).    Plaintiff appeared at the hearing with counsel and testified. (R. at 628-82).  A vocational expert (the "VE") also testified at the hearing. (R. at 629).

At the time of the hearing, plaintiff was fifty-nine years old. (R. at 634).  She testified that she has a high school education.  (Id).  She has past relevant work experience as a title clerk and office cleaner.  (R. at 639-43).  At the time of her application, plaintiff worked part-time as a notary approximately seven hours a day, two days a week.  (R. at 72).  Plaintiff alleges that she began working as a self-employed notary in 2001, did not work in 2002, and returned to her work in August 2003.  (Id.)  The VE testified about the availability of positions for an individual with medium exertion, light exertion and a sedentary work level in the national and regional economies. (R. at 672- 78).

The ALJ ordered a consultative examination after the hearing with respect to plaintiff's complaints of pain and weakness in her legs.  (R. at 21, 680).  A consultative evaluation was

performed by Dr. Lloyd Richless in September 2005.  (R. at 18).  In June 2006, additional

consultative examinations were performed by Dr. Anna Mathew and Dr. Eliot Michel.  (Id.)

    In the decision, dated October 26, 2006, (R. at 12-20), the ALJ determined that plaintiff is

not under a disability within the meaning of  §§ 216(i) and 223(d) of the SSA. (R. at 20).

Plaintiff filed a timely request to review the ALJ's decision, (R. at 7), which the Appeals Council

denied on December 7, 2007.  (R. at 4).  On February 26, 2008, plaintiff filed a complaint

seeking judicial review  of the ALJ's determination by this court.

### Plaintiff's Medical History

### Plaintiff's Medical History Pertaining to her Cardiac Complaints

    Plaintiff was admitted to Mercy Hospital in Pittsburgh, Pennsylvania on January 7, 2002

(R. at 153), after complaints of headaches and tingling in her left upper extremities. (Id.).  She

was diagnosed with a right carotid stenosis.[1]  (R. at 158).  An angiogram was performed that

showed a tight stenosis in the right internal carotid artery.  (Id.).  A right carotid endarterectomy[2]

was performed on that date. The records from Mercy Hospital indicate that, after the surgery,

plaintiff experienced numbness and heaviness in the left arm.  (R. at 153).  An examination after

the procedure revealed no blood clots or plaques in the right carotid artery.  (Id.)  A doppler

study[3] and ultrasound revealed that plaintiff's carotid was normal.  (Id.).  At the time of her

---

    [1]  "Right carotid stenosis" refers to abnormal narrowing of the carotid artery.  Dorland's
Illustrated Medical Dictionary, 302, 1795 (Saunders, et al., eds., 31st ed. 2007).

    [2]  Endarterectomy is a procedure for excising a thickened artery.  Id. at 623.  It is
performed on a carotid artery for prevention of a stroke.  Id.

    [3]  Plaintiff had several doppler studies performed between the date of this procedure and
the date of her application, which were normal. (R. at 212, 238, 248, 258, 264).  A doppler study

discharge, plaintiff's records indicate that she was stable, had no recurrent symptoms and left arm numbness and heaviness had improved to the point that it was nearly nonexistent. (Id.).

Plaintiff was discharged with instructions to follow up after two weeks with her surgeon, to refrain from smoking and was ordered occupational therapy as an outpatient for her left arm. (Id.)  She was prescribed aspirin and plavix and was directed to continue her previous medicines, which included hydrochlorothiazide and Prilosec. (R. at 154-55).

On May 24, 2002, plaintiff was admitted to Mercy Hospital with occlusion (blockage) of the superficial femoral artery on the right side and peripheral vascular disease.[4]  (R. at 176). Prior to her admission, plaintiff had complaints of severe pain in her left lower extremities. (R. at 309).  A femoropopliteal (above the knee) bypass graft of the saphenous vein was performed. (R. at 178).  The records indicate that post-operation plaintiff had a palpable dorsalis pedal pulse[5] and that procedure was uneventful. ( R. at 181).  Plaintiff had some edema and was directed to elevate her legs and to follow up with her surgeon after a week.  (Id.).

On June 4, 2002, plaintiff was seen at Mercy Hospital for an infection in her leg following the May 24, 2002 femoropopliteal bypass.  (R. at 183).  Plaintiff was diagnosed as having cellulitis in the area of the incision.  (Id.)  She was admitted to Mercy Hospital for IV antibiotics.  (R. at 185).  She was discharged on June 10, 2002, with instructions to continue

---

is an ultrasound that evaluates blood vessels.  It is used to determine "cardiovascular blood flow."  Dorland's Illustrated Medical Dictionary, 369, 2027 (Saunders, et al., eds., 31st ed. 2007).

[4]  "Peripheral vascular disease" refers to diseases of the blood vessels away from the heart and brain.  Id. at 1437, 2054.

[5]  This phrase refers to the pulse found at the back of the foot. Id. at 1576-77.

4

medications, antibiotics and to refrain from lifting anything over ten pounds for two weeks.  (R. at 188).

On follow-up examination in August 2002, plaintiff's vascular surgeon, Dr. Villella, noted that plaintiff had a palpable right dorsalis pedis pulse and a strong left femoral pulse.  (R. at 308).  According to the records, plaintiff had complaints of swelling in her right leg and left hip pain while walking.  (Id.).  Dr. Villella opined that these conditions were not due to lack of circulation or arterial insufficiency, but more likely due to arthritis.  (Id.).

Plaintiff was admitted to the emergency room at Armstrong County Memorial Hospital ("ACMH") on December 21, 2003, with complaint a chief complaint of dizziness.  (R. at 199). A CAT scan was performed, which was normal.  (Id.)  The treating physician's impression was that plaintiff suffered from probable TIA.[6]  (Id.)  He ordered plaintiff to follow up with Dr. Villela.  (R. at 205).

 On December 30, 2003, plaintiff was admitted to ACMH.  (R. at 212).  She complained that the symptoms of numbness on her left side, dizziness and slurring of speech sustained after the fem/prop bypass had worsened. (R. at 213).  A CT scan of plaintiff's brain was performed on December 21, 2003, for complaints of dizziness.  (R. at 207).  The results were normal.  (Id.). "Her initial cardiac workup was negative."  (R. at 213).  Her physician questioned whether she suffered from TIA and not "cardiac related symptoms."  (R. at 214).  CT scans of her head and chest were performed, which were normal.  (R. at 230-31).  An angiography was also performed

_____

[6]  TIA is the acronym for "transient ischemic attack," which refers to "mini-strokes" or temporary blood clots in the arteries, preventing adequate blood-flow to the brain.  American Heart Association, http://www.americanheart.org/presenter.jhtml?identifier=4781 (last visited Aug. 24, 2009).

and showed no evidence of aneurysms or occluded vessels.  (R. at 233).  An angiography of the neck performed on December 31, 2003, however, showed a high grade stenosis of the distal common carotid artery and the adjacent carotid blub.  (R. at 234).  The physician's notes indicate that he did not find this to be significant.  (Id.).  Doppler samplings were normal. (R. at 238-39). She was given antivert for vertigo and Tylenol for headaches. (R. at 220).

Plaintiff was seen by Dr. Villella on December 31, 2003 while she was in Mercy Hospital regarding her complaints of dizziness.  (R. at 244).  On January 3, 2004, Dr. Frederick Crock, a cardiologist, examined her.  (R at 247).  Dr. Crock's impression was that plaintiff had either previous cerebrovascular accident with residual scarring and ischemia or benign positional vertigo.  (R. at 248).  He prescribed Lisinopril for control of her high blood pressure.  (Id.).  He wanted her lipid profile checked and to see the results of an echocardiogram.  (R. at 248).  A doppler study was performed on January 2, 2004,  which was normal. (R. at 258-59).  A stress test was performed on January 4, 2004, and was also normal. (R. at 260-61).

Plaintiff underwent an echocardiogram on March 12, 2004. (R. at 286).  The results of this test were normal. (Id.).  Another stress test was performed in May 2005, which was normal and showed no evidence of changes suggesting ischemia.  (R. at 473).

Plaintiff was seen at ACMH on March 10, 2006.  (R. at 604).  On March 28, 2006, plaintiff was treated for "focal high grade stenosis in the proximal right common femoral to popliteal artery bypass graft."  (R. at 599).  The stenosis was successfully ballooned and dilated "with good angiographic results." (Id.).  The records state that there was improved blood flow following the procedure without significant residual stenosis.  (Id.).

***Medical History Pertaining to Plaintiff's Lung, Thoracic and Gastrointestinal***

***Problems***

Plaintiff's medical records indicate that she had a chest x-ray taken on August 6, 2002. (R. at 300).  Aside from a granuloma, noted since June 24, 1977, there was nothing notable in the lungs. (Id.).  The records indicate that there was no evidence of pulmonary disease.  (Id.) Plaintiff's chest was x-rayed again on October 24, 2002.  (R. at 299).  The results were normal. (Id.).

Plaintiff was admitted to ACMH on December 14, 2004 complaining of abdominal pain and vomiting.  (R. at 349).   She was examined for possible acute pancreatitis and history of diverticulitis.  (R. at 350).  She was referred to Dr. Lipsitz, who performed an esophagogastroduodenoscopy and biopsy.  (R. at 355).  After this procedure, plaintiff was diagnosed with gastritis and duodenitis.  (Id.).  A CT scan of plaintiff's abdomen was done on December 14, 2004.  (R. at 360).  At this time, Dr. Buck noted tiny pulmonary nodules in plaintiff's right lung.  (Id.).   Plaintiff followed up with Dr. Robert Keenan, a thoracic surgeon in regard to the nodules.  (R. at 377).  Dr. Keenan's assessment was that the nodules should be closely followed, but that they were stable.  (R. at 382, 401).  A follow up in May 2005 showed that the nodules had "remained absolutely stable."  (R. at 478).

Plaintiff underwent a colonoscopy on January 6, 2005.  (R. at 402).  She was diagnosed with colon polyps, which were removed, and diverticulitis of the ascending colon.  (Id.).

***Plaintiff's Medical History Pertaining to Osteoporisis, Hypothyroidism and Other Conditions***

Plaintiff was been treated for several other health problems.  An examination of plaintiff's lumbar spine on November 5, 2004, showed that there was no trauma to plaintiff's back, but that

she had degenerative disk and joint changes in the lower reaches of the lumbar spine and vascular calcifications.  (R. at 441).  She was diagnosed with osteoporosis of the lumbar spine and borderline osteoporosis of the femoral neck.  (R. at 465).  She was prescribed Caltrate, vitamin D and Foltx.  (R. at 530).

Plaintiff underwent a sleep study in May 2005. (R. at 446).  She was found to have significant obstructive sleep apnea and given a CPAP machine.  (R. at 446).  She was seen by an endocrinologist, who diagnosed her with hypothyroidism secondary to Hashimoto's thyroditis and benign adrenal mass.  (R. at 360, 529).  She is treated with synthroid.  (R at 530).  She receives treatment for depression by her family physician.  (R. at 661).  She is prescribed Effexor and Xanax, as needed.  (R. at  661).  She has not been hospitalized or treated by a  psychiatrist. (R. at 325).

### Medical Evidence Provided by Consultative Physicians

#### Dr. Richless

Plaintiff was examined by Dr. Lloyd Richless on September 29, 2005. (R. at 498). After examining plaintiff, Dr. Richless found that 1) plaintiff has a small right-sided CVA[7] with minimal residual impairment. (R. at 501); 2) she has probable TIAs, hypertension that is controlled, benign pulmonary nodules, chronic bronchitis and early COPD; 3) she has past right femoral artery bypass with no intermittent claudication; 4) she can frequently lift two to three pounds and occasionally ten and twenty pounds; and 5) she can frequently carry two to three pounds and occasionally carry ten pounds.  (R. at 501-03).  He determined that plaintiff can stand

---

[7] CVA is the acronym for cerebrovascular accident, which is a stroke.  Dorland's Illustrated Medical Dictionary, 459 (Saunders, et al., eds., 31st ed. 2007).

for three hours of an eight-hour day and walk for one-half hour to one hour.  (Id.).  According to

Dr. Richless, plaintiff had no limitations for sitting or pushing and pulling.  (Id.).  He noted that

plaintiff can occasionally bend, kneel, stoop or crouch, but can never balance or climb.  (R. at

504).

### Dr. Mathew

After examination performed on June 16, 2006, (R. at 606), Dr. Anna Mathew found that

plaintiff has osteoarthritis of the lumbosacaral spine and her symptoms of weakness are

secondary to sedentary activities, depression and becoming deconditioned as a result of her

multiple medical events.  (R. at 610).  Dr. Mathew opined that plaintiff would benefit from

physical therapy and increased activity, in addition to more aggressive treatment for anxiety and

depression.  (Id.).  Dr. Mathew opined that plaintiff "is currently functioning at a sedentary to

light level of work.  This could increase with improvement in her general strength and attention

to deconditioning."  (Id.).  In a medical assessment form completed by Dr. Mathew,  Dr. Mathew

checked boxes to reflect the maximum frequency for lifting and carrying was two to five pounds

and noted that the medical findings supporting that assessment were "multiple medical problems,

general weakness."  (R. at 617).  Dr. Mathew also noted, based upon the same medical findings,

that plaintiff could stand or walk approximately three hours in an eight-hour day and could only

stand or walk one-half to three-quarters hour without interruption.  (R. at 618).

### Dr.  Michel

Dr. Elliot Michel examined plaintiff on June 5, 2006.  (R. at 623).  After performing a

physical examination, he found that plaintiff has orthostatic hypotension.  (R. at 625). He noted

plaintiff's history of peripheral vascular disease,  post lower extremity angioplasty, right carotid

endarterectomy for high grade stenosis and TIA.  (R. at 625).  In Dr. Michel's opinion, plaintiff's prognosis is poor.  (Id.).

### Standard of Review

A denial by the Commissioner of a claimant's benefits is subject to judicial review.  42 U.S.C. §405(g).  This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C. §405(g).  "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla."  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless whether the court would have differently decided the factual inquiry).

### Discussion

Under Title II of the SSA, the term "disability" is defined as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 416(i)(1)(A); 423(d)(1)(A); 20 C.F.R. § 404.1505.  A person is unable to engage in substantial activity when she:

> is not only unable to do [her] previous work but cannot, considering [her] age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which [s]he lives, or whether a specific job
> vacancy exists for [her], or whether [s]he would be hired if [s]he applied for
> work. . . .

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under the SSA, a five-step sequential evaluation process must be applied. 20 C.F.R. § 404.1520; see McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. 20 C.F.R. § 404.1520(a)4(i). At step two, the Commissioner must determine whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a severe impairment, the third step is to determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant does not have an impairment which meets or equal the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent her from performing her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering her residual functional capacity ("RFC") and age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(v); see McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 269, 262-63 (3d Cir. 2000). The claimant has the burden of proof with respect to steps one through four and the Commissioner has the burden of proof with respect to step five. Burns, 312 F.3d at 119.

In this case, the ALJ determined: (1) that plaintiff had not engaged in substantial gainful activity since December 5, 2001 (R. at 14); (2) that plaintiff suffers from severe impairments including her right femoral artery, requiring bypass surgery and a history of treatment for obesity, obstructive sleep apnea, hypothyroidism, osteoporosis, gastritis, benign adrenal mass, benign lung nodules, bilateral lower extremity weakness/tremors, chronic bronchitis, early chronic obstructive pulmonary disease and depression (R. at 14-15); (3) plaintiff does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. part 404, subpart p, appendix. 1 (R. at 15); (4) plaintiff's impairments do not prevent her from performing past relevant work as a notary, which is sedentary to light work[8] (R. at 15-16); and (5) plaintiff is capable of performing other sedentary to light jobs existing in the local economy.  (R. at 19).  Plaintiff challenges step four of the evaluation process, arguing that the ALJ failed to determine properly plaintiff's RFC.  (Doc. No. 8 at 16-17).

At step four of the sequential evaluation process, the administrative law judge must determine whether the claimant has the RFC to perform past relevant work.  20 C.F.R. § 404.1520(d); see Plummer, 186 F.3d at 428.  The claimant bears the burden of demonstrating that she is unable to return to her past relevant work.  Plummer, 186 F.3d at 428 (citing Adorno

---

[8] "Light" work is work that involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range or light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

12

v. Shalala, 40 F.3d 43, 46 (3d Cir.1994)). The United States Court of Appeals for the Third

Circuit has set forth a three-step analysis for determining whether a claimant is capable of

performing past relevant work:

> (1) the ALJ must make specific findings of fact as to the claimant's residual
> functional capacity; (2) the ALJ must make findings of the physical and mental
> demands of the claimant's past relevant work; and (3) the ALJ must compare the
> residual functional capacity to the past relevant work to determine whether
> claimant has the level of capability needed to perform the past relevant work.

Burnett v. Comm'r of Soc. Sec., 220 F.3d at 120 (citing 20 C.F.R. § 404.1561; S.S.R. 82-62;

Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir.1996)); see also Frazier v. Comm'r of Soc. Sec.,

240 Fed. App'x 495, 498 (3d Cir. 2007) (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.

1981)) (holding that, in determining a claimant's RFC, an administrative law judge "must be

explicit about what evidence was considered and what evidence was rejected").

### a.    *Determination of Plaintiff's RFC*

"'Residual Functional Capacity is defined as that which an individual is still able to do

despite the limitations caused by his or her impairment(s).'" Fargnoli v. Massanari, 247 F.3d 34,

40 (3d Cir. 2001) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000))

(quotations omitted); see 20 C.F.R. § 404.1525(a)(1).  In determining a claimant's RFC, all of

the claimant's impairments, including those not considered "severe" must be considered.  20

C.F.R. § 404.1545(a)(2).  An administrative law judge is required to consider all the evidence

before him, including the medical evidence,  the claimant's subjective complaints and the

evidence of the claimant's activity level.  Burnett, 220 F.3d at 121 (citing Plummer, 186 F.3d at

429; Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986)); see Van Horn v. Schweiker, 717 F.2d

871, 873 (3d Cir. 1983); <u>Fargnoli</u>, 247 F.3d at 41 (holding that an administrative law judge must

consider all evidence including "medical records, observations made during formal medical

examinations, descriptions of limitations by the claimant and others, and observations of the

claimant's limitations by others").

   Plaintiff raises the two specific issues with respect to the ALJ's determination of

plaintiff's RFC:

1.   Whether the ALJ erroneously evaluated the medical evidence in determining that
     plaintiff has the RFC to perform sedentary to light work and past relevant work as
     a title clerk at step four; and

2.   Whether the ALJ erroneously misrepresented plaintiff's testimony concerning her
     activities of daily living and improperly relied upon those misrepresentations as a
     basis for denying benefits.

The court will address each issue raised.

> ### 1.   *Whether the ALJ Erroneously Evaluated the Medical Evidence in Determining that Plaintiff has the RFC to Perform Sedentary to Light Work, Including Past Relevant Work as a Title Clerk.*

   Plaintiff argues that the medical evidence of record, and the evidence specifically relied

upon by the ALJ in making his determination establish that plaintiff is incapable of performing

light work.  Specifically, plaintiff asserts that the ALJ's determination of her RFC is inconsistent

with the opinion of Dr. Anna Mathew, despite the ALJ's contention that he afforded her opinion

the "greatest weight."  (Pl.'s Br., Doc. No. 8 at 11).  Plaintiff argues, that "[t]he residual

functional capacity that Dr. Matthews [sic] attributes to [Plaintiff] does not support the ALJ's

specific findings or the definition of light work as contained in the Regulations" and "Dr.

Richless' and Matthews' [sic] opinions establish a functional capacity" lower than that of light work.  (Id.)

As the finder of fact, an administrative law judge is required to review, properly consider and weigh all the medical records provided concerning the claimant's claims of disability. Fargnoli, 247 F.3d at 42 (citing Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir. 1979)). "In doing so, an ALJ may not make 'speculative inferences from medical reports.'"  Plummer, 186 F.3d at 429 (quoting Smith v. Califano, 637 F.2d 968, 972 (3d Cir.1981)).  An administrative law judge may not substitute his own opinions for the opinions of an examining physician.  Id. (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)). When the medical evidence of records conflicts, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Id. (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)). An administrative law judge must consider all the evidence and give some reason for dismissing the evidence he chooses to reject.  Id. (citing Stewart v. Sec'y of H.E.W., 714 F.2d 287, 290 (3d Cir.1983)).

Plaintiff argues that while the ALJ purported to rely heavily on Dr. Mathew's opinion, he did not explain why he did not credit Dr. Matthew's findings about the limitation of plaintiff being able to lift and carry frequently two to five pounds and the limitation of plaintiff to only three hours standing or walking in an eight-hour day.  The ALJ considered the records from Dr. Mathew and afforded her conclusions more weight. (R. at 18).  The ALJ found that Dr. Mathew's assessments were fully supported by the medical evidence provided by plaintiff's treating physicians.  (Id.).  The ALJ, however, did not refer to or discuss the limitations found by Dr. Mathew that are inconsistent with light work, i.e, no frequent lifting or carrying of over five

pounds and no standing or walking for more than three hours in an eight-hour day.  An ability to lift and carry up to ten pounds frequently is necessary for light work.[9]

The ALJ compared the records provided by plaintiff's primary care physician, in addition to her vascular surgeon and several other specialists, to those of the consultative physicians.  (Id.) The ALJ gave specific reasons to explain why he gave little weight to the opinions of Dr. Richless and Dr. Michel.  (R. at 18).  In particular, the ALJ found that Dr. Richless' opinion that plaintiff could lift or carry only two to three pounds and occasionally twenty pounds was inconsistent with Dr. Richless' own internal findings that plaintiff suffered from probable TIA, controlled hypertension, probable benign pulmonary nodules, post right femoral artery bypass with no evidence of intermittent claudication and persistent smoking resulting in chronic bronchitis and early chronic obstructive pulmonary disease.  (R. at 18).  The ALJ concluded that Dr. Richless' opinion regarding plaintiff's ability to lift and carry was inconsistent with his opinions regarding plaintiff's ability to walk for an hour and one-half and stand for three hours, as well as occasionally bend, kneel, stoop and crouch.  (Id.)  The ALJ discounted this opinion because he found that it conflicted with the medical evidence produced by plaintiff's physicians, as well as plaintiff's own testimony regarding her activities of daily living.  (Id.)  The ALJ afforded Dr. Michel's assessment limited weight, as it was based on a single evaluation and was not supported by records documenting treatment from plaintiff's family doctor and specialists. (R. at 18-19).

The ALJ found that, while the assessments of Drs. Richless and  Michel conflicted with that of Dr. Mathew, they also conflicted with "new medical evidence" provided by plaintiff's

---

[9]See note 8 supra.

treating physicians.  (Id.).  Based on Dr. Mathew's assessment of plaintiff's symptoms, plaintiff's medical history related to her cardiac and other impairments, plaintiff's own reports of function and recent records provided by treating physicians, the ALJ found that her RFC is more properly light, as opposed to medium,[10] as found by the State agency physicians.  (R. at 19).  The ALJ held that plaintiff had the RFC to do light work "which involves . . . frequently lifting and carrying 10 pounds . . . ."  (R. at 16).

While the ALJ adequately explained his reasons for affording little weight to support the opinions of Dr. Richless and Dr. Michel, the court is unable to discern why he did not credit all the limitations found by Dr. Mathew, especially in light of the ALJ's determination to give weight to Dr. Mathew's conclusions.  Under those circumstances, this case must be remanded for the ALJ to explain why he did not credit Dr. Mathew's findings with respect to the limitations on frequent lifting to five pounds and on standing or walking for no more than three hours in an eight-hour day.

> **2.     Whether the ALJ erroneously misrepresented plaintiff's testimony concerning her activities of daily living and improperly relied upon those misrepresentations in determining plaintiff's RFC**

In addition to considering the medical evidence, an administrative law judge must consider nonmedical evidence offered by the claimant, including evidence of her limitations. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981).  A claimant's subjective complaints of physical pain and other symptoms must be supported by objective medical evidence.  20 C.F.R. § 1416.929(c).  "The authority to evaluate the credibility of [the claimant] concerning pain and

---

[10] "Medium" work is defined as work that involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567( c).

other subjective complaints is reserved for the ALJ."  Gilmore v. Barnhart, 356 F.Supp. 2d 509,

513 (3d Cir. 2005) (citations omitted). While an administrative law judge must give a claimant's

subjective complaints "serious consideration," Powell v. Barnhart, 437 F.Supp. 2d 340, 342

(E.D. Pa. 2006) (citing Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002)), "the ALJ may

reject a claimant's complaints if he does not find them credible." Id. (citing Schaudeck v.

Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999)); see Baerga v. Richardson, 500 F.2d

309, 312 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975)) (holding that the ALJ may reject a

claimant's subjective complaints of "disabling pain if he affirmatively addresses the claim in his

decision, specifies the reason for rejecting it, and has support for his conclusion in the record");

Hirschfield v. Apfel, 159 F.Supp. 2d 802, 811 (E.D. Pa. 2001)(citing Capoferri v. Harris, 501

F.Supp. 32, 37 (E.D. Pa. 1980), aff'd 649 F.2d 858 (3d Cir. 1981).  "[I]f supported by substantial

evidence, the ALJ's credibility findings may not be disturbed upon appeal."  Hirschfield, 159

F.Supp. 2d at 811 (citing Van Horn v. Schweiker, 717 F.2d 871, 871 (3d Cir.1983)); Smith v.

Califano, 637 F.2d 968, 972 (3d Cir.1981); Baerga, 500 F.2d at 312.

In his determination, the ALJ considered plaintiff's subjective complaints of symptoms,

including her allegations of clogged arteries, mini strokes, dizziness, loss of equilibrium and loss

of memory.  (R. at 16).  He compared plaintiff's complaints to plaintiff's self-reported activities,

including her ability to live independently, make the bed, move furniture, prepare meals, do

finances, mow the lawn, take out the trash, vacuum, do laundry, drive, shop, carry shopping bags,

sew, use the computer, work as a notary two days a week and do household chores.  (Id.).  He

considered that plaintiff performed all these tasks, but takes breaks.  (Id.).  The ALJ noted that

plaintiff testified that her leg pain "comes and goes" and the she has cognitive difficulties.  (R. at

18

16).  He noted her complaints that she cannot walk far because she gets cramps in the back of her legs and that she has to move every hour and one-half when sitting."  (R. at 17).

The ALJ noted plaintiff's testimony that she must elevate her legs often, but that, among other things, she goes to church three times a month, attends meetings, visits family and friends and traveled to Atlantic City during the relevant time period.  (Id.).

In evaluating this evidence, the ALJ found that plaintiff's activities, in combination with the "generally conservative nature of her medical care" supported his determination to discount her testimony about the frequency, severity and extent of functional limitations.  (Id.).  The ALJ found that, while plaintiff's complaints of symptoms were reasonable, her allegations concerning the limiting effects of her symptoms were not  entirely credible.  (Id.).  The ALJ, however, did not fully describe plaintiff's testimony regarding her specific daily activities.

Plaintiff testified she cannot dress or bathe independently, take out the trash, or prepare meals without taking breaks.  (R. at 662-65).  Plaintiff stated that she is able shop in a wheelchair for "half the time," do laundry, but needs to sit to fold it, and does some household chores, but cannot sweep, mop or vacuum.  (R. at 664-65).  The ALJ noted that plaintiff's ability to do these tasks required her to take breaks, that pain in her legs "comes and goes" and that she cannot walk far because of cramps in the back of her legs.  (R. at 16-17).  The ALJ discounted plaintiff's testimony regarding the severity of her symptoms and inability to perform and complete tasks as conflicting with other testimony by plaintiff regarding her daily functioning, as well as the medical evidence from her treating physicians and the opinions of the consultative examiners. (R. at 17).  The ALJ noted that plaintiff's allegations regarding her limitations were not consistent with her testimony that she attends church and meetings, visits with family and took a

19

trip to Atlantic City in May 2005, which was an eight-hour drive during which she stopped six times.  (Id.).  Plaintiff, however, testified that during the trip to Atlantic City she rode in a van which had a bed in the back where she slept.  (R. at 670).  Activities such as attending church and meetings and visiting family do not implicate the ability to perform light work.  Sleeping in a van likewise does not implicate the ability to perform light work.  The ALJ found plaintiff's claim that she cannot function independently was not entirely credible based upon the rather nonaggressive treatment for pain (i.e., 600 mg ibuprofen) and depression and considered her living in a split-level home, as well as her ability to sit through a hearing before him without issue, notable in determining that plaintiff's subjective complaints are not supported by the evidence.  (Id.).

While the ALJ affirmatively addressed plaintiff's complaints of disabling symptoms, he glossed over the severity of the limitations on plaintiff's daily activities to which she testified.  In light of the necessity to remand this case for other reasons, the ALJ should address on remand the severity of the limitations to which plaintiff testified in assessing whether her self-described activities are consistent with the ability to do light work.

### Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment (Docket No. 7) and defendant's motion for summary judgment (Docket No. 9) will be denied. The case will be remanded to the Commissioner for further proceedings consistent with this opinion.  An appropriate order follows.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: August 28, 2009